Jesse Hindman, Cal. Bar No. 222935
**HINDMAN APC**
402 W. Broadway, Suite 2700
San Diego, CA 92101
Telephone: (619) 255-4078
Facsimile: (619) 230-1839
Email: jesse@hindmanapc.com

Donald R. Ware, Mass. Bar No. 516260
Email: dware@foleyhoag.com
*pro hac vice* application forthcoming
Barbara A. Fiacco, Mass. Bar No. 633618
Email: bfiacco@foleyhoag.com
*pro hac vice* application forthcoming
Marco J. Quina, Mass. Bar No. 661660
Email: mquina@foleyhoag.com
*pro hac vice* application forthcoming
**FOLEY HOAG LLP**
155 Seaport Boulevard
Boston, MA 02210
Phone: (617) 832-1000
Fax: (617) 832-7000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and BECTON, DICKINSON AND COMPANY,<br><br>        Plaintiffs,<br><br>    v.<br><br>AFFYMETRIX, INC. and LIFE TECHNOLOGIES CORP.,<br><br>        Defendants. | Case No. **'17 CV 1394 AJB NLS**<br><br>**PLAINTIFFS' ORIGINAL COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

- 1 -

**COMPLAINT**

Plaintiffs The Regents of the University of California ("The Regents") and Becton, Dickinson and Company ("BD") file this Complaint against Defendants Affymetrix, Inc. ("Affymetrix") and Life Technologies Corp. ("Life Technologies"). In support of their claims, Plaintiffs allege as follows:

**Nature of the Action**

1.      This is an action for patent infringement brought under the patent laws of the United States, 35 U.S.C. § 1 et seq. Plaintiffs seek a judgment that Defendants have infringed and continue to infringe, directly and indirectly, United States Patent No. 9,085,799 ("the '799 patent"); United States Patent No. 8,110,673 ("the '673 patent"); and United States Patent No. 8,835,113 ("the '113 patent") (collectively, the "Asserted Patents"). By way of remedy, Plaintiffs seek damages and preliminary and permanent injunctive relief.

2.      The Asserted Patents disclose innovative new systems and methods based on the discovery of high brightness polymer dyes, which allow scientists to efficiently detect the presence, in a sample, of biological materials of interest. The patented technology was invented by scientists at University of California Santa Barbara ("UCSB") and subsequently licensed to BD. It has led to the creation of a new class of fluorescent research reagents called "polymer tandem dyes." Such dyes fluoresce much more brightly than traditional fluorescent dyes.

3.      One important application of the inventions is in flow cytometry, a technology that is used to measure, sort, or count cell populations and biomarkers. UCSB's inventions enable scientists using flow cytometry to more easily identify small cell populations that previously might go undetected, or to distinguish a multitude of cell types or cell markers that previously could be indistinguishable, when traditional fluorescent dyes were used. For BD, UCSB's pioneering technology has opened the door to new business opportunities and provided a competitive advantage, allowing it to build market leadership and strengthen its

1  brand as the innovator in research reagents.

2      4.      In recent months, however, Defendants have launched copycat

3  products they call "Super Bright Dyes," exploiting UCSB's pioneering technology

4  to reap the rewards the patent system reserves to innovators.  Since December, they

5  have launched three infringing polymer tandem dyes, and more than 150 new

6  reagent products based on these dyes, marketing them as "comparable" or

7  "alternatives" to BD's licensed products.  In June, Defendants promised their

8  customers that "many more" such products would be released in the future, and

9  Plaintiffs believe that Defendants will do exactly that unless their continued

10  infringement is prevented by court order.

11                                   **Parties**

12      5.      The Regents is charged by California law with the duty of

13  administering the University of California as a public trust, pursuant to Article IX

14  § 9 of the California Constitution.

15      6.      BD is a New Jersey corporation having its principal place of business

16  at 1 Becton Drive, Franklin Lakes, NJ 07417.  BD has a regular and established

17  place of business at 11077 North Torrey Pines Road, La Jolla, CA.

18      7.      On information and belief, Affymetrix is a Delaware corporation

19  having its principal place of business at 3420 Central Expressway, Santa Clara, CA.

20  On information and belief, Affymetrix has a regular and established place of

21  business at 10255 Science Center Dr., San Diego, CA.

22      8.      On information and belief, Life Technologies is a Delaware

23  corporation having its principal place of business at 5791 Van Allen Way,

24  Carlsbad, CA 92008.

25      9.      On information and belief, Defendants are wholly owned subsidiaries

26  of Thermo Fisher Scientific, Inc., a Delaware corporation.

27                          **Jurisdiction and Venue**

28      10.     This Court has subject matter jurisdiction over this action under 28

- 3 -

PLAINTIFF'S ORIGINAL COMPLAINT

U.S.C. §§ 1331 and 1338(a).

11.   This Court has personal jurisdiction over Affymetrix because, on information and belief, Affymetrix has a regular and established place of business at 3420 Central Expressway, Santa Clara, CA 95051, and it has engaged in, and made meaningful preparations to engage in, infringing conduct in California.

12.   This Court has personal jurisdiction over Life Technologies because, on information and belief, Life Technologies has its principal place of business at 5791 Van Allen Way, Carlsbad, CA 92008, and it has engaged in, and made meaningful preparations to engage in, infringing conduct in California.

13.   Venue is proper in this district under 28 U.S.C. § 1400(b) because both Affymetrix and Life Technologies have committed acts of infringement and have a regular and established place of business in this district.

## The Patents

14.   In biological research, scientists identify cells and other molecular entities by detecting various biomarkers.  An effective way to detect such markers involves the use of fluorescent dyes (also known as fluorochromes or fluorophores). A fluorochrome is a chemical compound, or a discrete unit within a chemical compound, that, when illuminated by light of a particular wavelength (that is, a particular color), can absorb that light to enter an excited state and then emit light at a different wavelength.  This emitted light is called fluorescence.  Each fluorochrome has a characteristic band of wavelengths for the light it can absorb, and a different band of wavelengths for the light it can emit.

15.   The use of fluorochromes allows scientists to label biological materials of interest in a variety of research applications.  One such application involves using an instrument called a "flow cytometer," which can characterize, count, or sort the various cell types in a sample of blood or other bodily fluid.  The sample is placed in a stream of fluid that enables the cells to flow through a detector single file.

16.     With flow cytometry, fluorochromes are chemically bound to various different antibodies, each of which can bind only to a particular protein.  If the target protein is present on the cell, the antibody will bind to the protein, and the fluorochrome attached to the antibody will be detected when light (such as from a laser) is shone onto the sample.  If the target protein is not on the cell, the antibody will have no attachment point, and no fluorescence will be detected.  By binding fluorochromes having different absorption and emission wavelengths to different antibodies, scientists can monitor multiple aspects of a biological system simultaneously, by illuminating the sample with various wavelengths of light and observing what different wavelengths of light, i.e., what different colors of light, are emitted.

17.     Historically, most fluorescent dyes have been either small molecules or fluorescent proteins.  More recently, however, a new class of fluorochrome was developed, referred to as a polymer dye.  Polymer dyes have an extended and repeated chemical structure that includes multiple chromophores that can interact with each other through the polymer's conjugated electronic system.  This makes them much better collectors of light and much brighter fluorochromes.

18.     In the early 2000s, the inventors of the Asserted Patents, members of Professor Guillermo Bazan's research group at the University of California, Santa Barbara ("UCSB"), discovered water-soluble polymer dyes that could very efficiently transfer their energy to traditional small molecule fluorochromes.  In these multi-chromophore systems, called "polymer tandem dyes", the polymer dye would absorb light at its characteristic absorption wavelengths, and the small molecule fluorochrome, after receiving energy transfer from the polymer, would then emit light at its characteristic wavelength.  This technological advance increased the combinations of excitation and emission wavelengths available for researchers to use, and took advantage of the multi-fold increase in brightness that polymer dyes provide.  This innovation by the inventors has enabled scientists

1  using flow cytometry to more reliably detect small cell populations within a

2  sample, which would otherwise register only dimly in a flow cytometer, thus

3  increasing the number of such populations that can be studied and the quality of the

4  data that researchers could obtain.

5       19.    On July 21, 2015, the United States Patent and Trademark Office

6  issued the '799 patent, entitled "Methods and Compositions for Detection and

7  Analysis of Polynucleotides Using Light Harvesting Multichromophores."  The

8  Regents owns by assignment the entire right, title, and interest in and to the '799

9  patent.  A true and correct copy of the '799 patent is attached as Exhibit A.

10       20.    The claims of the '799 patent are generally directed to a method of

11  analyzing a sample using a system that combines a water-soluble polymer dye and a

12  fluorochrome.  When these two components are chemically bonded, they are

13  referred to as a polymer tandem dye.  The polymer dye is capable of entering into

14  an excited state, and the fluorochrome is capable of receiving energy from that

15  excited state.  The system is constructed such that the transfer of energy from the

16  polymer to the fluorochrome results in at least a four-fold enhancement of emission

17  from the fluorochrome.

18       21.    On February 7, 2012, the United States Patent and Trademark Office

19  issued the '673 patent, entitled "Aggregation Sensor and Solutions and Kits

20  Comprising the Same."  The Regents owns by assignment the entire right, title, and

21  interest in and to the '673 patent.  A true and correct copy of the '673 patent is

22  attached as Exhibit B.

23       22.    The claims of the '673 patent are generally directed to a chemical

24  compound that combines a water-soluble polymer dye and a fluorochrome.  The

25  polymer dye is capable of entering into an excited state, and the fluorochrome is

26  capable of receiving energy from that excited state.  The polymer dye and the

27  fluorochrome are chemically bonded to one another, and the polymer dye must

28  contain at least three chromophores for every one fluorochrome attached to it.

23.     On September 16, 2014, the United States Patent and Trademark Office issued the '113 patent, entitled "Methods and Compositions for Assaying a Sample for an Aggregant."  The Regents owns by assignment the entire right, title, and interest in and to the '113 patent.  A true and correct copy of the '113 patent is attached as Exhibit C.

24.     The claims of the '113 patent are generally directed to a method of using the compound claimed in the '673 patent.  The compound of the '673 patent is combined with a sample.  Then the sample is subjected to a fluorescence measurement by illuminating the sample with light (such as from a laser) at a wavelength that the polymer dye can absorb, and detecting the light emitted from the fluorochrome.

**Becton Dickinson and the BD Horizon Brilliant™ Dyes**

25.     BD is a leading global medical technology company, founded in 1897, that develops, manufactures and sells medical devices, instrument systems and reagents.  BD is dedicated to improving people's health throughout the world.  BD serves healthcare institutions, life science researchers, clinical laboratories, pharmaceutical companies, and the general public.

26.     BD Biosciences is a business unit within BD.  BD Biosciences is a world leader in bringing innovative diagnostic and research tools to life scientists, clinical researchers, and laboratories.  BD Biosciences focuses on advancing the science associated with cellular analysis.  BD Biosciences products include fluorescence-activated cell sorters and analyzers, as well as reagent systems for those instruments that include antibodies bound to fluorescent dyes.

27.     BD is the exclusive licensee of the '799, '673, and '113 patents owned by The Regents.

28.     BD's current products include the BD Horizon Brilliant™ dyes, which are a series of polymer dyes and associated polymer tandem dyes for use in biological research.  Building on the polymer dye technology developed at USCB,

the BD Horizon Brilliant™ dyes are some of the brightest dyes in the industry, and allow researchers to use one laser to excite multiple colors of dye.  For example, the BD Horizon Brilliant™ UltraViolet (BUV) line of products includes five different fluorochromes (one polymer base dye and four polymer tandem dyes) that are all activated by a 355-nm wavelength ultraviolet laser but emit light at different wavelengths.   Because they can be bound to antibodies having specificity for different proteins marking different cells, these products greatly increase the number of biomarkers and cell types that can be detected using a single laser.  The BD Horizon Brilliant™ Violet (BV) product line includes eight different fluorochromes (three polymer base dyes and five polymer tandem dyes) that are all activated by a 407-nm wavelength violet laser and can be used to detect a variety of different biomarkers and cell types.

## Defendants and their Infringing Super Bright Dyes

29.     Defendants recently began selling research reagents that include a polymer dye, denominated Super Bright 436, and additional research reagents that include certain polymer tandem dyes based on Super Bright 436: Super Bright 600, Super Bright 645, and Super Bright 702.  By making and selling products incorporating the polymer tandem dyes Super Bright 600, Super Bright 645 and Super Bright 702 (the "Accused Products"), Defendants are infringing the Asserted Patents.

30.     Defendants' marketing materials blatantly promote the Accused Products as equivalent or superior alternatives to specific dyes in the BD Horizon Brilliant™ Violet line.  Super Bright 600 is marketed, inter alia, as being "comparable in brightness to Brilliant Violet 605."  Super Bright 645 is marketed, inter alia, as being "comparable, and sometimes superior in brightness to Brilliant Violet 650 . . . with less spill over into other violet channels."  Super Bright 702 is marketed, inter alia, as being "similar in brightness to Brilliant Violet 711 . . . with reduced compensation and less spillover into the Brilliant Violet 786 channel."

Defendants' marketing materials also provide spectral and other direct comparisons between the Super Bright dyes and BD's Horizon Brilliant™ Violet line.

31.     Each of the Accused Products includes a water-soluble polymer dye, Super Bright 436, which is a component of each of the Accused Products.  Each of the Accused Products also includes a different fluorochrome.  The polymer dye can transfer energy from its excited state to the fluorochrome in each of the Accused Products.  As explained above, the different fluorochromes provide fluorescence at different wavelengths.  The polymer dye in the Accused Products has a conjugated, delocalized electronic structure.

32.     On information and belief, the polymer dye in the Accused Products is chemically bonded to the fluorochrome.  On information and belief, the polymer dye includes three chromophores for each fluorochrome bonded to it.

33.     Defendants' website provides fluorescence excitation spectra for the Accused Products.  As these spectra show, the energy transfer from the polymer dye to the fluorochrome provides a greater than four-fold increase in fluorescence emission from the signaling chromophore than can be achieved by direct excitation of the fluorochrome alone.

34.     In the instructions for Super Bright Dyes, Defendants direct users to contact a sample with the dye, illuminate the sample with a light source, and detect whether light is emitted from the sample.

35.     On information and belief, Defendants manufacture the Accused Products in the United States, import the Accused Products into the United States, market the Accused Products in the United States, offer the Accused Products for sale in the United States, and/or sell the Accused Products in the United States.

### Count I: Infringement of U.S. Patent No. 9,085,799

36.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 35 above as though fully set forth herein.

37.     The '799 patent has one independent claim, claim 1, which recites:

A method comprising:

(a) contacting a sample with a light harvesting multichromophore system, the system comprising:

i) a signaling chromophore; and

ii) a water-soluble conjugated polymer comprising a delocalized electronic structure, wherein the polymer can transfer energy from its excited state to the signaling chromophore to provide a greater than 4 fold increase in fluorescence emission from the signaling chromophore than can be achieved by direct excitation of the signaling chromophore in the absence of the polymer;

(b) applying a light source to the sample; and

(c) detecting whether light is emitted from the signaling chromophore.

38.     Defendants have induced, and continue to actively induce, infringement of at least claims 1 and 3 of the '799 patent under 35 U.S.C. § 271(b). By at least the date of service of this Complaint, Defendants know of the '799 patent, and that their continuing conduct and communications induce customers of the Accused Products to directly infringe the '799 patent. For instance, Defendants instruct, direct, and encourage customers of the Accused Products on the use of the Accused Products with the knowledge that such use infringes the '799 patent and intending that others perform the infringing activities. On information and belief, such conduct by Defendants was intended to and actually resulted in direct infringement by their customers, either literally or under the doctrine of equivalents.

39.     Defendants have and continue to contributorily infringe, at least claims 1 and 3 of the '799 patent under 35 U.S.C. § 271(c), by selling and/or offering for sale in the United States, and/or importing into the United States the Accused Products, a material part of the invention of the '799 patent, knowing that the Accused Products are especially made or adapted to infringe the '799 patent, and are not a staple article or commodity of commerce suitable for substantial non-infringing use. On information and belief, such conduct by Defendants was

1  intended to, and actually resulted in, direct infringement by their customers, either

2  literally or under the doctrine of equivalents.

3      40.  Plaintiffs have suffered damages as a result of Defendants' direct and

4  indirect infringement of the '799 patent and will continue to suffer damages as long

5  as those infringing activities continue.

6      41.  Plaintiffs have been and will continue to be irreparably harmed by

7  Defendants' direct and indirect infringement of the '799 patent unless and until

8  such infringement is enjoined by this Court.

9      **Count II: Infringement of U.S. Patent No. 8,110,673**

10      42.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

11  through 35 above as though fully set forth herein.

12      43.  The '673 patent has one independent claim, claim 1, which recites:

13      An aggregation sensor soluble in a polar medium comprising:

14      (a) a conjugated polymer comprising

15
16      a plurality of first optically active units forming a conjugated system, having
a first absorption wavelength at which the first optically active units absorbs light to
17  form an excited state, and

18      a plurality of solubilizing functionalities; and

19
20      (b) one or more second optically active units that can receive energy from the
excited state of the first optically active unit;

21
22      said aggregation sensor comprising at least three first optically active units
per second optically active unit;

23      wherein the second optically active unit is grafted to the conjugated polymer.

24      44.  Defendants have and continue to infringe at least claims 1-3, 5, 7-12,

25  and 14-20 of the '673 patent under 35 U.S.C. § 271(a).

26      45.  On information and belief, each of the Accused Products comprises a

27  conjugated polymer comprising a plurality of first optically active units forming a

28  conjugated system, having a first absorption wavelength at which the first optically

active units absorb light to form an excited state, and a plurality of solubilizing functionalities.

46.     On information and belief, each of the Accused Products comprises one or more second optically active units that can receive energy from the excited state of the first optically active unit.

47.     On information and belief, each of the Accused Products comprises at least three first optically active units per second optically active unit.

48.     On information and belief, in each of the Accused Products, the second optically active unit is grafted to the conjugated polymer.

49.     Plaintiffs have suffered damages as a result of Defendants infringement of the '673 patent and will continue to suffer damages as long as those infringing activities continue.

50.     Plaintiffs have been and will continue to be irreparably harmed by Defendants' infringement of the '673 patent unless and until such infringement is enjoined by this Court.

## Count III: Infringement of U.S. Patent No. 8,835,113

51.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 35 above as though fully set forth herein.

52.     The '113 patent has one independent claim, claim 1, which recites:

A method of assaying a sample for an aggregant, the method comprising:

(a) combining the sample with an aggregation sensor comprising

(i) a polymer comprising a plurality of first optically active units forming a conjugated system, having a first absorption wavelength at which the first optically active units absorb light to form an excited state that can emit light of a first emission wavelength, and a plurality of solubilizing functionalities; and

(ii) one or more second optically active units that can receive energy from the excited state of the first optically active unit;

wherein said aggregation sensor comprises at least three first optically active units per second optically active unit and the second optically active unit is grafted

to the conjugated system;

(b) contacting the sample with light of the first absorption wavelength; and

(c) detecting the optical properties of the aggregation sensor to assay the sample for the aggregant.

53.     Defendants have and continue to actively induce infringement of at least claims 1-5, 10, 22, and 25-27 of the '113 patent under 35 U.S.C. § 271(b). Defendants know of the '113 patent by at least the date of service of this Complaint, and that their continuing conduct and communications induce customers of the Accused Products to directly infringe the '113 patent.  For instance, Defendants instruct, direct, and encourage customers of the Accused Products on the use of the Accused Products with the knowledge that such use infringes the '113 patent and intending that others perform the infringing activities. On information and belief, such conduct by Defendants was intended to and actually resulted in direct infringement by their customers, either literally or under the doctrine of equivalents.

54.     Defendants have and continue to contributorily infringe at least claims 1-5, 10, 22, and 25-27 of the '113 patent under 35 U.S.C. § 271(c), by selling and/or offering for sale in the United States, and/or importing into the United States, the Accused Products, a material part of the invention of the '113 patent, knowing that the Accused Products are especially made or adapted to infringe the '113 patent, and are not a staple article or commodity of commerce suitable for substantial non-infringing use.  On information and belief, such conduct by Defendants was intended to, and actually resulted in, direct infringement by their customers, either literally or under the doctrine of equivalents.

55.     On information and belief, each of the Accused Products comprises a conjugated polymer comprising a plurality of first optically active units forming a conjugated system, having a first absorption wavelength at which the first optically active units absorb light to form an excited state, and a plurality of solubilizing

- 13 -

1   functionalities.

2        56.    On information and belief, each of the Accused Products comprises

3   one or more second optically active units that can receive energy from the excited

4   state of the first optically active unit.

5        57.    On information and belief, each of the Accused Products comprises at

6   least three first optically active units per second optically active unit.

7        58.    On information and belief, in each of the Accused Products, the second

8   optically active unit is grafted to the conjugated polymer.

9        59.    The instructions for the Accused Products direct their users to combine

10   a sample with the dye, contact the sample with light of the first absorption

11   wavelength, and detect the optical properties of the Accused Product to assay the

12   sample for the aggregant.

13        60.    Plaintiffs have suffered damages as a result of Defendants' direct and

14   indirect infringement of the '113 patent and will continue to suffer damages as long

15   as those infringing activities continue.

16        61.    Plaintiffs have been and will continue to be irreparably harmed by

17   Defendants' direct and indirect infringement of the '113 patent unless and until

18   such infringement is enjoined by this Court.

19                          **JURY DEMAND**

20        62.    Plaintiffs demand a jury trial in this matter.

21                       **PRAYER FOR RELIEF**

22        WHEREFORE, Plaintiffs respectfully request that the Court:

23        A.    Enter judgment that Defendants have infringed the '799, '673, and

24   '113 patents;

25        B.    Enter a preliminary injunction enjoining Defendants, their officers,

26   directors, servants, managers, employees, agents, attorneys, successors and

27   assignees, and all persons in active concert or participation with any of them, from

28   further acts of infringement of the '799 patent, under 35 U.S.C. § 283;

1    C.     Enter a permanent injunction enjoining Defendants, their officers,

2    directors, servants, managers, employees, agents, attorneys, successors and

3    assignees, and all persons in active concert or participation with any of them, from

4    further acts of infringement of the '799, '673, and '113 patents, under 35 U.S.C.

5    § 283;

6    D.     Award damages adequate to compensate Plaintiffs for Defendants'

7    infringement together with pre-judgment and post-judgment interest and costs,

8    under 35 U.S.C. § 284;

9    E.     Enter judgment that this case is exceptional and award Plaintiffs their

10   reasonable attorneys' fees, costs, and expenses, under 35 U.S.C. § 285; and

11   F.     Award such other and further relief as this Court may deem just and

12   proper.

13   Dated:     July 10, 2017              Respectfully submitted,

14

15                                        By */s/ Jesse Hindman*
16                                           Jesse Hindman
                                             HINDMAN APC
17                                           Attorneys for Plaintiffs The Regents of
                                             University of California and Becton,
18                                           Dickinson and Company
19                                           Email:  jesse@hindmanapc.com

20

21

22

23

24

25

26

27

28

- 15 -

PLAINTIFF'S ORIGINAL COMPLAINT